FOUNDRY SERVICES, Inc. v. BENE-
FLUX CORPORATION.

No. 262, Docket 22690.

United States Court of Appeals
Second Circuit.

Argued April 17, 1953.

Decided July 14, 1953.

Cahill, Gordon, Zachry & Reindel, New York City, for defendant-appellant. Jerrold G. Van Cise, Jerome Doyle, William M. Sayre, New York City, of counsel.

Glass & Lynch, New York City, for plaintiff-appellee. Simon Brett, New York City, of counsel.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Plaintiff-appellee and Foundry Services, Limited, an English corporation, are parties to a contract concerning the manufacture and sale of fluxes and related products made according to secret processes owned by the latter. One of the provisions of the contract, which is called a license agreement, is that Foundry Services Ltd. would not manufacture or sell such products in the United States or Canada. The plaintiff brought this suit to enjoin defendant The Beneflux Corp., a wholly owned subsidiary of Foundry Services Ltd., from violating this provision, and for damages and an accounting for profits attributable to violations which have already occurred. This appeal is from an order granting the plaintiff-appellee's motion for an injunction *pendente lite*.

In 1932 the English corporation, owning and controlling various secret processes, recipes and formulae, began to manufacture fluxes and allied products used to facilitate the casting of molten metal. It sold its products in England and on the continent of Europe, but not in the United States or Canada. The appellee, then in business in the United States, did not deal in products of the kind made by Foundry Services Ltd.; and in 1934 the appellee made the contract with Foundry Services Ltd. which is the basis of this suit. The now pertinent rights and obligations of the parties pursuant to the terms of that contract follow.

The appellee, therein called the Licensees, was granted an exclusive license to manufacture and sell in the United States and Canada, but not elsewhere, the products of the English corporation, called the Licensors. The English corporation agreed

to communicate at once to the appellee a full and accurate description of the secret processes, recipes and formulae then possessed by it and also of all new products, developments and alterations while the agreement remained in force.

The appellee was to pay to the Licensors royalties based on sales, with a minimum annual royalty of $250 for the first year, $500 for the second, $1,000 for the third, and $1250 thereafter. The appellee also agreed not to "manufacture, sell or be interested in the manufacture or sale of any fluxes, or other products competitive with the products of the subject of this agreement during the continuance of this agreement and for a period of two years after the termination thereof."

The original contract term was five years, but the appellee was given the right to continued renewals of that term provided it made annual sales at least equal to stated minimum amounts. It was further provided that the Licensees could terminate the agreement by giving the Licensors "six calendar months notice of their intention so to do" and, if the Licensees did not make sales equal to the specified minimum amounts for two consecutive years the Licensors could terminate the agreement by giving a like notice.

For a while the contract was performed in a way that was apparently mutually satisfactory; but after some years the Licensors, whose business elsewhere had flourished, became dissatisfied with the amount of sales made by the appellee. This dissatisfaction brought about its decision in 1951 to try to get relief from the provisions prohibiting its making sales in the United States and Canada in competition with the appellee.

It so happened that a business firm in Mexico wanted a sample of one of the fluxes that were covered by the agreement, and early in April 1951 it sent a check for $5.00 to the Licensees and requested that as much flux of the type desired as that sum would buy be sent to it. On April 9, the Licensees wrote to the Licensors that the request had been received and also another inquiry from Mexico. The Licensees suggested that, if arrangements for Mexican representation had not been concluded, they could make shipments there and they requested the views of the Licensors on that matter. In the course of following correspondence on that subject, the Licensors learned that five pounds of flux had been sent in response to the request. It later attempted to terminate the agreement by notice, on the ground that the Licensees had broken it by making the sale. The Licensees did not acquiesce in that attempt at termination and, at least for present purposes, the appellant does not rely upon it.

After this unsuccessful effort to get rid of the restrictive provisions of the contract, the Licensors organized a subsidiary corporation under the laws of Delaware, the appellant here, through which it began to compete in 1952 with the appellee in the sale of fluxes and allied products made according to the secret processes. This suit was then brought and the order, from which this appeal has been taken, was made.

The appellant now seeks reversal on two independent grounds. The first is that the contract is invalid because it provides for an unlawful restraint of trade in violation of the anti-trust laws by dividing the available competitive area and creates areas within which competition is prevented for a period which may be forever. The second is that it was neither shown nor found that the competition of the appellant would cause the appellee irreparable injury.

The district judge considered the first ground and, in a well reasoned opinion, held it insufficient to foreclose the right he thought the appellee had otherwise shown to the protection of a temporary injunction. He did not find that in the absence of such an injunction the appellee would suffer irreparable injury.

As to the first ground the appellee has argued that since the agreement relates to secret processes and to the sale of products manufactured thereunder, the agreement does not restrain trade in any unlawful way; and that, broadly speaking, was the view taken by the district judge. However, we think it is neither advisable nor necessary to decide at this time whether the con-

tract is valid. It is enough to notice that there is a substantial doubt about that and such an involved question is so bound up with the particular facts and circumstances that it is better first to let them be fully developed at a trial and findings made after that has been done.

The injunction *pendente lite* was improvidently granted if there has been no finding or showing that without it the appellee would suffer irreparable injury. Aeolian Co. v. Fischer, 2 Cir., 29 F.2d 679; American Mercury v. Kiely, 2 Cir., 19 F.2d 295; Behre v. Anchor Ins. Co. of New York, 2 Cir., 297 F. 986.

Pending final decision in the suit, the injunction restrained the appellant and those acting with it from selling the fluxes and related products in the United States and "from providing or offering to provide in the United States any technical data or other products and from interfering otherwise with the exclusive license granted to the plaintiff under the terms of the agreement * * *"

█ █ It serves to prevent the appellant from competing or from aiding others in competing with the appellee in the United States. The ordinary and natural result of such competition would be to dampen the sales of the appellee; but since any loss so caused could, if a wrong, be adequately redressed by money damages ascertainable upon proof, it does not constitute the irreparable injury necessary to justify an injunction *pendente lite*. Nor is there anything here to indicate that this appellee is threatened with any other kind of injury. It is well settled that, absent a showing of irreparable injury of some kind, no injunction *pendente lite* should be granted, and that is especially so where, as here, the effect of such an injunction is prematurely to give the party seeking it a substantial part of the relief sought in the final judgment. American Mercury v. Kiely, supra; Behre v. Anchor Ins. Co. of New York, supra.

Order reversed and injunction dissolved.

L. HAND, Circuit Judge (concurring):

I concur in the result, but only upon the "first" defence mentioned in my brothers' opinion. The plaintiff indeed has failed to show any "irreparable injury," if by that is meant that money will not satisfy any loss that the defendant's competition will cause; nevertheless it has shown such an injury, if that includes the impossibility of ascertaining with any accuracy the extent of the loss. That has always been included in its meaning; and I cannot see how the plaintiff will ever be able to prove what sales the defendant's competition will make it lose, to say nothing of the indirect, though at times far-reaching, effects upon its good will as the only licensee of the British company. On the other hand, I agree that we should refuse a temporary injunction because the contract on which the plaintiff's claim must rest, "provides for an unlawful restraint of trade in violation of the antitrust laws." I do not indeed mean that we should decide that question on this record; and I am not at all sure that in the end the defence will turn out to be good. Yet, when the British company undertook not to sell any other products that would compete with the subject of the license, I have a serious doubt whether that covenant was valid; and if it was not, whether the plaintiff is entitled to equitable relief. We considered the question in Parev Products Co. v. I. Rokeach, 2 Cir., 124 F.2d 147, and left it open how far such a covenant might be construed as a necessary protection to any enjoyment of the license by the licensee. Maybe in the case at bar the covenant can stand on that ground; but we should not decide this question until it has been developed at a trial how far its scope may properly be so limited. The situation is a tempting one to maintain the status quo against what is at best an unpalatable defence; and I am not sure that, if my brothers wished to affirm the order on this ground, I could not be persuaded to join them. However, as they wish to reverse it, the clause gives enough support to that result to induce me to concur.