# CASES

## ARGUED AND DETERMINED

### IN THE

## CIRCUIT COURTS OF APPEALS AND DISTRICT COURTS OF THE UNITED STATES, AND COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

BURROWS & KENYON, Inc., v. WARREN.

(Circuit Court of Appeals, First Circuit. December 7, 1925.)

No. 1870.

1. Sales �824164—Shipment of lumber held not good tender of delivery.

Shipment containing 259,995 feet of lumber in excess of quantities ordered in certain items, and undershipment of 83,379 feet in other items, *held* not good tender of delivery under order calling for 684,551 feet in specified sizes.

2. Trial �824136(3)—Construction of writings is ordinarily for court, and not for jury.

Construction of writings is ordinarily for court, and not for jury.

3. Sales �824176(3)—Buyer's refusal to take excess held not agreement to accept undershipment.

Buyer's telegram, refusing to take excess shipment of certain items of order, was not agreement to accept undershipment of other items, either as complete performance or as installment, but was at most a refusal to take excess at contract price, and did not waive shortage, in view of Gen. Laws R. I. 1923, c. 307, §§ 4, 5.

4. Contracts �824143—Court cannot speculate, nor permit jury to speculate, as to reasonableness or importance of provisions of commercial contracts.

Court cannot speculate, nor permit jury to speculate, as to reasonableness or importance of provisions of commercial contracts.

5. Sales �824154—Court cannot say that provisions in order requiring signed bills of lading to accompany invoices are of no importance to buyer.

Court cannot say that provisions in buyer's order requiring signed bills of lading to accompany invoices, and to be sent buyer on day goods are shipped, are not of financial and business importance to buyer.

6. Customs and usages �824017—Contract for specific quantities of lumber cannot be contradicted or varied by custom permitting delivery of substantially greater quantity.

Contract calling for specific quantities of definitely described lumber cannot be varied or

contradicted by custom permitting delivery of substantially greater quantity, either in certain items or in aggregate.

7. Sales �824164—Contract for definitely described lumber held not performed by delivery of half the quantity of double sizes.

Contract calling for definitely described lumber is not performed by delivery of half the quantity ordered of double sizes, requiring resawing by buyer, notwithstanding proof of custom.

In Error to the District Court of the United States for the District of Rhode Island; James M. Morton, Judge.

Action by Lingan A. Warren against Burrows & Kenyon, Inc. Judgment for plaintiff, and defendant brings error. Judgment vacated, verdict set aside, and case remanded.

Charles E. Tilley and Ralph M. Greenlaw, both of Providence, R. I. (Ralph M. Greenlaw and Greenlaw, Tilley & Tetlow, all of Providence, R. I., on the brief), for plaintiff in error.

Harold L. Perrin, of Boston, Mass. (Perrin, Robbins & Babb, of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This is an action for breach of a contract for the purchase of lumber, brought by Lingan A. Warren of Jacksonville, Fla. (herein called the seller), against Burrows & Kenyon, Inc., of Providence, R. I. (herein called the buyer). The seller had a verdict for $4,809.38. The existence and terms of the contract are not in dispute.

But the buyer insists that the seller was himself in default; that he never made a legally sufficient offer to perform. The main question is as to whether the court below should have ordered a verdict for the de-

9 F.(2d)—1

fendant. Minor questions are as to the admission of evidence as to custom, and as to a special finding of the jury of waiver by the buyer.

[1] Most of the material terms of the contract are found in a written order from the buyer, dated February 11, 1924, addressed to the seller in New York, where he maintained an office, as follows:

"Please furnish the following, subject to conditions stated hereon:

"Ship to Burrows & Kenyon, Inc., South Providence, R. I., via vessel. Delivery required early April shipment. Terms: Three months note from arrival without interest. * * *"

Then follow 32 items of "merchantable long-leaf yellow pine, rough," of which 21 items are of specifically defined quantities of described lumber, sufficiently illustrated by the following:

"28,743 ft. 3x 6—16 to 30′ (avg. 22′)
 36,092 " 6x 8— " " " " " "
  5,310 " 16x16— " " " " " "

On their face, these items were for definitely ascertained needs of the buyer.

Eleven items are in round figures for thousands of feet, as:

"20,000 ft. 10x10—16 to 30′ (avg. 22′),
 30,000 " 10x14— " " " " " "

Possibly these items might be regarded as intended for a general stock.

The aggregate is "684,551 ft. at $50 per M." "Delivered free of unloading charges on our dock."

Of the five conditions stated in the order, only 2, 3, and 5 seem now material:

"2. Separate invoices for each order must be rendered to the purchasing department the day the goods are shipped. Signed bills of lading must accompany invoices for freight shipments.

"3. All material furnished must conform with our specifications when indicated, and, if not in accordance therewith, same will be held at your risk awaiting disposition. Shippers must pay all transportation charges both ways on rejected material."

"5. Piece tally must accompany each invoice."

On the next day the buyer wrote the seller with reference to this order:

"It is understood that we are to receive this lumber not to exceed 40,000 feet per day.

"We would also ask that in making your charter, if possible, to load the lumber through the hatches. We can give the vessel very much greater dispatch than if the lumber is loaded through the ports."

This order, as accepted, required the buyer to pay the freight on delivery, deducting it from the aggregate purchase price of $34,-227.55, for the balance of which a noninterest-bearing three months note was to be given. Such was the written contract, except that later correspondence waived the April date for shipment, so that no question as to time limit now arises.

Prior to June 26, 1924, the seller loaded over 1,000,000 feet of lumber upon the schooner Virginia Pendleton, of which 200,-000 (in one place in the record it is stated as 275,000) were destined for a customer in Fall River, and 861,167 feet were invoiced to the buyer at $50 per M, an aggregate price of $43,058.35, of which the freight was stated to be $5,812.88, leaving $37,245.47 to be paid by notes or acceptances. We may note, although probably immaterial, that, when this schooner was loaded at Jacksonville, the seller then had in his yard lumber from which he could have filled the order exactly. But he testifies that to pick out from the mass the lumber called for by the contract would have entailed handling nearly double the quantity shipped, and delayed the sailing of the vessel; that he consequently permitted the stevedore to load it as he chose, relying on the purchasers being friendly customers, who would take and sell it to their customers. There was, therefore, no real claim by the seller that the lumber on the schooner complied with the terms of the contract.

The invoice of this shipment of 861,167 feet was received through the mail by the buyer on June 26. The market for lumber had then dropped.

The buyer's letter (containing copies of two telegrams) of June 26 to the seller discloses both the conduct of the buyer and the material facts upon which the buyer acted:

"We received to-day the invoice of the cargo of the Virginia Pendleton. We wired you to-day as follows:

" 'Invoice shows cargo schooner Virginia Pendleton two hundred thousand feet in excess of order. We decline to accept excess.' (Telegram.)

" 'Further comparison of invoice of cargo of schooner Virginia Pendleton with our order A—1461 shows order has not been filled in accordance with specifications of said order. We therefore decline to receive the cargo. It will be necessary for you to dispose of cargo elsewhere.' (Telegram.)

"In the nearly thirty years that the writer has been in the lumber business, he never recalls a shipment of a schedule of lumber in

which so little attention has been paid to the specifications of the order.

"You have overrun items on the schedule to the amount of 259,995 feet, and you have undershipped items on the schedule to the amount of 83,379 feet. The overrun is practically all on small and undesirable sizes, and the undershipment is entirely on the desirable sizes. The variations on the items run from 4 or 5 per cent. up to 200 per cent. on several, and on the item of 3x12 there is variation of 900 per cent.

"While the lumber was to have been shipped in April, we have not crowded you on the shipment, although we have stood ready to take it, so that there is no excuse for the manner in which the stock was shipped.

"To be brief and to the point, the cargo is entirely unacceptable to us, and we decline to receive it. We have, therefore, entered cancellation of our order A–1461. Please make record accordingly to this effect on your books."

The first telegram, supra, was sent on the morning of June 26, simply on the information from a clerk that there was about 200,000 feet of excess. The second telegram was sent after further examination of the invoice, which disclosed the wide discrepancies from the specifications of the order. There is no dispute that the invoice covered an excess of 259,995 feet on about two-thirds of the items and an undershipment of 83,379 feet on the other items, as stated in this letter.

Thereupon the seller instructed his New York agent to see the buyer and adjust to the buyer's satisfaction. Negotiations ensued, about which there is lengthy and conflicting evidence, in large part immaterial.

In the view we take of the case, it is unnecessary to review that evidence. It is clear on all the evidence—and, as noted above, is in effect admitted by the seller—that the lumber on this schooner was not a good tender of delivery under the contract.

At the trial, the seller finally put his case on a substitute offer of performance set forth in his letter of July 16, 1924, to the buyer, as follows:

"While I appreciate your Mr. E. O. Chase's courtesy to me yesterday, in our conference, I am obliged to protect my business and legal rights in this situation.

"In our letter of July 2d and in the writer's subsequent conversation with you at Providence, we have and we now do confirm the tender of the lumber ex schooner Virginia Pendleton to fill your order No. A–1461. We stand ready to remove, as we explained to you, and without expense to you, any lumber in that vessel which does not apply on your order, and to supply material from local stocks, if necessary, or for as prompt delivery as you may request, any shortage which may be found on the outturn of that vessel applying on your order.

"While we appreciate thoroughly your verbal statement yesterday that you would not accept the tender of this lumber, we wish to give you this formal opportunity to retract that decision and accept this tender of the lumber. We must protect ourselves against loss, and we cannot allow the vessel to go on demurrage because of indecision. Therefore, unless we hear from you, not later than 9 a. m. Thursday morning, July 17th, we will understand that, despite this notice, you stand on your verbal decision of yesterday; that you decline to accept the tender of the above cargo, although we hereby notify you that you must stand the consequences of this decision.

"We will immediately arrange to dispose of this cargo to the best possible advantage, and we hereby put you on notice that we shall look to your corporation to hold us harmless, and to reimburse us for any loss and expense to which we may be put in so disposing of the lumber on your order, which you decline to accept on this tender.

"We are mailing one copy of this letter to you in the open mail and one carbon by registered, special delivery, to insure its delivery to-day. You can reach the writer with an answer at the Hotel Westminster, Copley Square, Boston, Mass., where any communications addressed to him will be received and reach him during the day Thursday."

To this letter the buyer replied on July 17, as follows:

"We beg to acknowledge receipt of your favor of the 16th inst., and to call your attention to our telegrams and letter of June 26, 1924, in which you were specifically advised that we declined to accept the cargo of lumber on schooner Virginia Pendleton for the reason that the shipment was not in compliance with the order."

The seller thereupon sold the lumber at less than the contract price and brought this suit. The court left it to the jury to say whether the offer of delivery in this letter of July 16 was "a fair and reasonable offer of delivery under the circumstances," denying the buyer's motion for a directed verdict.

The court also submitted a special question to the jury, as follows:

"Did the defendant waive any right to object to the proposed delivery of so much

of the cargo as conformed to the contract on the ground that excess lumber was included in it?

"The jury answer: Yes."

[2, 3] We have difficulty in seeing any legal significance in this finding even if it is legally grounded. It is obviously nothing but the jury's interpretation of the buyer's telegram, supra, sent to the seller on the morning of June 26, when the buyer learned that the invoice covered 861,167 feet, instead of 684,-551 feet. The construction of writings is ordinarily for the court, not for the jury. Compare Goddard v. Foster, 17 Wall. 123, 142, 21 L. Ed. 589; General Motors v. Abell (C. C. A.) 292 F. 922, 926. There is no evidence that the seller took any action based on this telegram. 40 Cyc. 263. At most, it was but notice to the seller that the buyer refused to take the excess at the contract price. A refusal to take an overshipment is not an agreement to accept an undershipment —either as complete performance or as an installment. We assume, however, in favor of the seller, that the intermingling of the excess with the buyer's order would not, alone, ground a right in the buyer to refuse delivery from this schooner of the full amount of the lumber contracted for, if such delivery could have been made without expense to the buyer or undue delay. But it is not even contended that such full delivery was possible, for there was an admitted shortage of 83,379 feet in 12 items of the schedule. This shortage the seller never offered to deliver "via vessel" at the buyer's dock; on the contrary, he demanded that the buyer should permit the seller to sort out at the buyer's dock, from the cargo in the schooner, about 600,000 feet alleged to conform to the contract; the seller merely offering to supply the deficit of 83,-379 feet "from local stocks, if necessary."

If we consider the offer of the lumber on the schooner alone, then the case falls within the following provision of the Uniform Sales Act (G. L. R. I. 1923, c. 307, § 4):

"Sec. 4. (1) Where the seller delivers to the buyer a quantity of goods less than he contracted to sell, the buyer may reject them, but if the buyer accepts or retains the goods so delivered, knowing that the seller is not going to perform the contract in full, he must pay for them at the contract rate. If, however, the buyer has used or disposed of the goods delivered before he knows that the seller is not going to perform his contract in full, the buyer shall not be liable for more than the fair value to him of the goods so received.

"(2) Where the seller delivers to the buyer a quantity of goods larger than he contracted to sell, the buyer may accept the goods included in the contract and reject the rest, or he may reject the whole. If the buyer accepts the whole of the goods so delivered he must pay for them at the contract rate.

"(3) Where the seller delivers to the buyer the goods he contracted to sell mixed with goods of a different description not included in the contract, the buyer may accept the goods which are in accordance with the contract and reject the rest, or he may reject the whole.

"(4) The provisions of this section are subject to any usage of trade, special agreement, or course of dealing between the parties."

But if we couple the offer of the lumber on the schooner with the offer to supply the balance "from local stocks, if necessary," the case falls under section 5(1) of the Uniform Sales Act:

"Sec. 5. (1) Unless otherwise agreed, the buyer of goods is not bound to accept delivery thereof by installments."

The same general rules in the construction of commercial contracts are illustrated in numerous cases, some of which are cited and reviewed in Norrington v. Wright, 115 U. S. 188, 6 S. Ct. 12, 29 L. Ed. 366. See also Filley v. Pope, 115 U. S. 213, 6 S. Ct. 19, 29 L. Ed. 372.

The present case falls under the principle asserted on most careful consideration by the House of Lords in Bowes v. Shand, 2 App. Cas. 455, where Lord Chancellor Cairns said:

"It does not appear to me to be a question for your Lordships, or for any court, to consider whether that is a contract which bears upon the face of it some reason, some explanation why it was made in that form, and why the stipulation is made that the shipment should be during these particular months. It is a mercantile contract, and merchants are not in the habit of placing upon their contracts stipulations to which they do not attach some value and importance." 2 App. Cas. 463. "If it be admitted that the literal meaning would imply, that the whole quantity must be put on board during a specified time, it is no answer to that literal meaning, it is no observation which can dispose of, or get rid of, or displace, that literal meaning, to say that it puts an additional burden on the seller, without a corresponding benefit to the purchaser; that is a matter of which the seller and the purchaser are the best judges. Nor is it any reason for saying that it would be a means by which purchasers

without any real cause would frequently obtain an excuse for rejecting contracts when prices had dropped. The nonfulfillment of any term in any contract is a means by which a purchaser is able to get rid of the contract when prices have dropped; but that is no reason why a term which is found in a contract should not be fulfilled."

A recent illustration of the same doctrine is found in a decision of the Circuit Court of Appeals for the Fourth Circuit in National Bank v. Lamborn, 2 F.(2d) 23, 36 A. L. R. 509. In that case, a contract for sale of sugar, "shipment to be made * * * from Java by steamer * * * to Philadelphia," was held not fulfilled by tender of sugar on steamer clearing from Java to New York, but diverted to Philadelphia. See, also, The Manhattan (C. C. A.) 284 F. 310.

[4, 5] The law is well settled that it is not for the court to speculate, or to permit juries to speculate, as to the reasonableness or importance of provisions written by the parties into their commercial contracts. But we note that in this case the buyers offered explicit and apparently uncontradicted testimony to the effect that acceptance of delivery of a part of the lumber from the schooner, and a later delivery of over 83,-000 feet from "local stocks," would impose upon the buyer a substantial additional expense, such as for surveyors and employees at the dock, as well as unwarranted obstruction of the buyer's dock for the seller's uses. Moreover, no court can say that the provisions in the buyer's order requiring signed bills of lading to accompany invoices, and to be sent the buyer the day the goods are shipped, were not of financial and business importance to the buyer. Of course, with delivery in installments, such possible use would be impaired or destroyed. The result is that we think the court erred in denying the defendant's motion for a directed verdict.

[6, 7] As it is possible there will be a new trial, we refer briefly to the assignments of error as to the admission of evidence concerning custom. Against the buyer's objection, the court admitted evidence of two customs: (1) That in the lumber business variations of about 10 per cent. from the quantities ordered are allowable; (2) that orders for smaller sizes are regarded as filled by shipping half the quantity of a double size, thus remitting the buyer to the task of resawing—for illustration, that orders for 3x8 may be regarded as filled by furnishing half the number of pieces of 6x8.

It is at least doubtful whether the evidence showed the existence of any custom, even if custom were admissible, to vary or explain this contract. See Ireland v. Clark, 109 Me. 239, 247, 83 A. 667; Great Western Elevator Co. v. White, 118 F. 406, 410, 56 C. C. A. 388; Ames Co. v. Kimball & S. Co., 125 F. 332; Auto, etc., Co. v. Merchants' Nat. Bank, 116 Md. 179, 81 A. 294. Compare 17 C. J. pp. 519, 520.

Apart from the fact that the custom seems not to have been proven, we think the case falls in this regard under the principle laid down by Mr. Justice Story in the Reeside Case, Fed. Cas. No. 11,657, 2 Sumn. 567:

"A written and express contract cannot be controlled, or varied, or contradicted by usage or custom."

This contract, as we construe it, called for specific quantities of definitely described lumber. It was not an order for a designated quantity, "more or less." Of course in this, as in every other contract, slight and immaterial variations, falling under the de minimis rule, do not vitiate. But to hold that a contract of this definite and express kind would be filled, if performed by tendering lumber substantially more or less (either in the items of the schedule or in the aggregate), would be to make a new contract.

So, also, as to the custom as to resawing. We cannot hold that a contract calling for delivery of specifically described lumber can be regarded as performed, on the assumption that the buyer has, at the point of delivery, or at any other convenient place, facilities for resawing the lumber into different sizes, and that the buyer is ready and willing, either with or without a reduction in price, to remanufacture pro tanto.

The judgment of the District Court is vacated, the verdict is set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion. The plaintiff in error recovers costs in this court.